## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | In Proceedings |
| | ) | Under Chapter 11 |
| | ) | |
| DJK ENTERPRISES, LLC, | ) | |
| | ) | Case No. 24-60126 |
| Debtor. | ) | |

## OPINION

This matter is before the Court on a Motion for Relief from the Automatic Stay filed by creditor Effingham Asset Funding (EAF) pursuant to 11 U.S.C. § 362((d)(1).  The Motion presents several issues for the Court's consideration: (1) whether Debtor in Possession DJK Enterprises waived its right to object to the Motion for Relief from Stay pursuant to the terms of a pre-petition forbearance agreement between the parties;  (2) whether EAF is entitled to relief from the stay in order to record a purported deed in lieu of foreclosure pursuant to the aforementioned agreement; and (3) whether "cause" exists under 11 U.S.C. § 362(d)(1) to grant EAF relief from stay due to an alleged diminution in the value of the collateral securing its loan.

## FACTS

The following facts have either been stipulated to by the parties,[1]  or are supported by the record in this case.  Debtor DJK Enterprises, LLC (DJK or Debtor) is a family-owned business in Effingham, Illinois.  It operates a full-service hotel known as the Effingham Holiday Inn ("Hotel") as well as the Thelma Keller Convention Center ("Convention Center") and the TK Grille restaurant ("Restaurant").  All of these businesses are located on the Debtor's real property

---

[1] *See Joint Stipulation of Facts with Regard to Motion of Effingham Asset Funding, LLC for Relief from the Automatic Stay*, ECF Doc. 129.

located at 1202 North Keller & 1301 Avenue of Mid America in Effingham (collectively the "Property" or "Properties").

On July 25, 2018, the Debtor executed a promissory note as amended ("Note") in the original principal sum of $10,500,000.00 in favor of St. Louis Bank. The Note is secured by a valid first mortgage lien pursuant to a mortgage dated July 25, 2018 against the Properties which was recorded on August 2, 2019 in the Effingham County Recorder's Office. The Note is also secured by an assignment of leases and rents as well as UCC financing statements on substantially all of the Debtor's assets, including cash on hand and monies generated by accounts receivable and sales.

The Note matured on December 25, 2023. At the time of maturity, the principal balance owed to St. Louis Bank was $10,042,353.22. Debtor failed to satisfy the obligation by the maturity date, and, consequently, it defaulted on the Note. Despite the default, however, between February 5, 2024 and March 28, 2024, the Debtor continued to make interest payments to St. Louis Bank on the Note totaling $138,000.00.

On April 2, 2024, St. Louis Bank assigned its Note, Mortgage, Loan Agreement, and lien securing the loan to EAF by an Assignment of Mortgage dated March 27, 2024 and recorded April 2, 2024. As a result of this Assignment, EAF, like St. Louis Bank, now holds a security interest in nearly all of the Debtor's assets, both real and personal property.

A. **The Forbearance Agreement**

On May 28, 2024, Debtor and EAF entered into an Agreement of Forbearance, Deed in Lieu of Foreclosure and Irrevocable Escrow Instructions ("Agreement"). *See Agreement*, Debtor's Trial Exhibit 4. Pursuant to Paragraph 2 of the Agreement, the Lender, EAF, agreed to forbear from collection of its loan and enforcement of its rights under its loan documents for a

period of seventy-five (75) days from the effective date of the Agreement.  During this seventy-five-day period, Debtor was required, *inter alia*, to make three (3) $50,000.00 interest payments to EAF, maintain property and liability insurance on the Properties, and, with several noted exceptions, comply with the terms of the loan agreement.  If the Debtor failed to comply with these terms during the forbearance period, EAF was required to provide Debtor written notice of default stating the specific breach or violation.  If Debtor failed to cure the violation within ten (10) days of the written notice, the Agreement provided that EAF may, at its option proceed with the Agreement, or "elect to terminate [the] Agreement upon written notice to [Debtor], and immediately pursue all rights and remedies available to it under the Loan Documents, without further notice, grace or cure period."  *Id.*  Although the Debtor made two of the requisite interest payments during the forbearance period, the third payment, which became due on August 12, 2024-- after the filing of the Debtor's bankruptcy petition-- was not made.[2]

In exchange for EAF's forbearance under its loan documents, the Debtor agreed not only to the conditions outlined above, but also to pay its entire outstanding indebtedness to EAF before the expiration of the seventy-five-day forbearance period.  If Debtor was unable to pay off the loan within the prescribed period, Debtor agreed to convey the Property to EAF via a deed in lieu of foreclosure, pursuant to the terms and conditions set forth in the Agreement.  Debtor's Trial Exhibit 4, ¶ 2.  Paragraph 4 of the Agreement, titled DELIVERY IN ESCROW, CONVEYANCE OF THE PROPERTY, states, in pertinent part:

> In consideration for Lender agreeing to forbear as set forth above, Borrower has agreed to execute and deposit an original wet ink signed and acknowledged special warranty deed in recordable form…(the "Deed") and an original wet ink signed bill of sale for all personal property encumbered by the Lien…into…an escrow to be conducted by Fidelity National Title Insurance Company…or

---

[2] EAF admits that it did not give Debtor the requisite ten-day written notice of default upon Debtor's failure to make the final $50,000.00 interest payment, *Stipulation of Facts*, ECF Doc. 129, ¶ 36.

> another title insurance company acceptable to Lender ("Escrow Holder"), pursuant to this Agreement, which shall constitute irrevocable escrow instructions for Escrow Holder to (i) hold the Deed and the Bill of Sale until on or after the Deadline and (ii) on the next business day after the Deadline or such later date as Lender directs the Escrow Holder, record the Deed in the Official Records of Effingham County, IL, and release the Bill of Sale to Lender or its designee, provided, however, that Lender may only record the Deed and release the Bill of Sale…if Borrower has failed to pay off the Loan prior to the Deadline…. Notwithstanding the forgoing, if Escrow Holder requires separate escrow instructions in lieu of being a signatory to this Agreement, Lender and Borrower shall jointly prepare, sign and deliver such separate escrow instructions in a form acceptable to Escrow Holder.

*Id.* at ¶ 4.

Christopher Keller, President of the Debtor, executed a Special Warranty Deed and a Bill of Sale (Deed in Lieu of Foreclosure), which the parties stipulate was delivered to Prairie Capital Partners, LLC, EAF's lender.[3]  However, the Escrow Holder named in the Agreement refused to serve as the escrow agent.  Consequently, the Deed and Bill of Sale were not placed in "irrevocable escrow" as required by the Agreement, but, rather, remained in the possession of Prairie Capital Partners' attorney until August 9, 2024, at which time they were delivered to True Title Company, LLC, an escrow agent selected unilaterally by EAF. *See Stipulation of Facts,* ECF Doc. 129, ¶¶ 38-41.

In addition to the foregoing, the Agreement placed several other relevant restrictions on the Debtor.  Pursuant to Paragraph 12, the Debtor was prohibited from filing bankruptcy prior to or within ninety-one (91) days after the recording of the Deed.  The parties acknowledged that if Debtor failed to repay the loan within the allotted time and the Deed was recorded, title would immediately transfer to EAF and Debtor would forfeit all legal rights to the equity in the Properties in any subsequent bankruptcy proceeding.  Finally, if the Debtor did file bankruptcy and the property subject to the Deed and Bill of Sale was deemed property of the bankruptcy

---

[3] Prairie Capital Partners is not a party to either the loan documents or the Forbearance Agreement.

estate, Debtor agreed that the Agreement would "constitute[its] consent to relief from the automatic stay of 11 U.S.C. § 362 immediately after the Deadline." *Forbearance Agreement,* Debtor's Trial Exhibit 4, ¶ 12.

### B. Bankruptcy and the Motion for Relief from Stay

On August 9, 2024, Debtor filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code.  EAF was listed as a secured creditor and the parties have stipulated for purposes of this Motion that EAF has an allowed fully secured claim in the amount of $10,750,000.00 as of December 10, 2024. *Stipulation of Facts,* ECF Doc. 129, ¶ 19. The parties have also stipulated that the Debtor has total secured debt of $11,493,494.00, which includes not only EAF's claim, but also obligations owed to the United States Small Business Administration (SBA) and to the Effingham County Treasurer. *Id.* at ¶¶ 24-27.   The SBA holds a lien against all of the Debtor's personal property and has a claim against the Debtor of approximately $500,000.00. *Id.* at ¶ 24. Debtor currently owes the Effingham County Treasurer ("Effingham County") approximately $243,494.00 for delinquent real estate taxes. *Id.* No parties other than EAF and Effingham County have a lien, claim, encumbrance, or other interest in the Debtor's real property. [4]

On September 6, 2024, EAF filed the instant Motion for Relief from Stay. By its motion, EAF seeks relief from the automatic stay to record the Deed in Lieu of Foreclosure and recover the collateral securing its Note. Although acknowledging that legal title to the Properties was held in Debtor's name as of the Petition date,[5]  EAF argues that Debtor's equitable interest in the Properties transferred to EAF upon execution of the Deed in Lieu of Foreclosure on May 28, 2024, such that the "transfer of title [to EAF] had already occurred before the filing of the

---

[4] The SBA holds a lien only as to the Debtor's personal property and it does not have a lien on the Debtor's real properties *Stipulation of Facts*, ECF Doc. 129, ¶ 24.
[5] *Motion of Effingham Asset Funding, LLC for Relief from Automatic Stay*. ECF Doc. 74, ¶ 18.

bankruptcy petition." *Effingham Asset Funding, LLC's Brief in Support of Motion for Relief from Automatic Stay*, ECF Doc. 123, p. 5 (internal quotations omitted). It maintains that because Debtor no longer has an interest in the Properties, sufficient cause exists to effectuate the parties' deed agreement and grant EAF relief from the stay under 11 U.S.C. § 362(a)(1). *Id.* at p. 9.

In addition to this ownership argument, EAF also asserts in the Motion for Relief that cause exists to lift the stay pursuant to 11 U.S.C. § 362(d)(1) due to the diminishing value of the Properties. It alleges that Debtor has not performed necessary maintenance and renovations required of Holiday Inn franchisees.  The value of the Properties depends on Debtor's ability to operate as a franchise hotel, and such value would decrease dramatically if Debtor's franchise status were revoked.  EAF alleges that Debtor has not proposed any feasible method by which to fund these requisite improvements and, consequently, the value of the Properties remains under continuing threat. *See EAF's Motion for Relief from Stay* at ¶¶ 21-26.

In objection to EAF's motion, Debtor disputes that execution of the Deed in Lieu of Foreclosure transferred Debtor's ownership of the property.  Instead, it argues that under applicable Illinois law, the Forbearance Agreement and Deed in Lieu of Foreclosure are either void, or, at best, granted EAF an equitable mortgage in the Properties. *Debtor's Reply in Opposition to Effingham Asset Funding, LLC's Motion for Relief from Stay*, ECF Doc. 124, p. 2. Debtor further alleges that it did not deliver the Deeds in an "irrevocable escrow" as required, nor has it consented to any such escrow. *Id.* at 10. Finally, it argues that there is no "cause" for granting relief given that the value of the Properties far exceed EAF's debt and Debtor's proposed Chapter 11 Plan proposes to pay its obligation to EAF in full. *Id.* at 11.

## **DISCUSSION**

### A.  **Did the Debtor Waive its Right to Contest the Motion for Relief from Stay?**

For its initial argument, EAF asserts that it is entitled to relief from stay pursuant to a "stay waiver" provision in the Forbearance Agreement. Paragraph 4 of the Agreement provides that in the event that the Debtor ever files bankruptcy, Debtor agrees that the Forbearance Agreement "shall constitute [its] consent to the automatic stay of 11 U.S.C. § 362 immediately after the Deadline." *Agreement*, Debtor's Trial Exhibit 4, ¶ 12.[6]

While it is well established that contractual waivers of the right to file bankruptcy are generally prohibited, *Continental Ins. Co. v. Thorpe Insulation Co (In re Thorpe Insulation Co)*, 671 F3d. 1011(9th Cir. 2012); *In re Edwards*, 439 B.R. 870 (Bankr. C.D. Ill. 2010), there is a split of authority as to whether prepetition waivers of the automatic stay are enforceable. "There is a sharp divergent view among courts regarding the utility, benefits, and desirability of enforcing automatic stay waivers," and "the conflicting views among courts regarding the enforceability of automatic stay waivers cannot be reconciled." Eisenson, Joshua, *Exploring the Enforceability of Pre-Petition Hinderance Mechanisms to Prevent Bankruptcy*, 4 St. John's Bankr. Research Libr. No. 12 (2012) at 10.

The court in *n re Triple A & R Capital Investment, Inc.*, 519 B.R. 581, 584 (Bankr. D. Puerto Rico 2014) summarized the various approaches that the courts have taken as follows:

> Although stay waivers were long thought to be unenforceable as against public policy, an increasing number of courts are now enforcing them.... A review of the cases nationwide that address this issue indicate a trend that appears toward the enforcement of stay waivers. The difficult issue of whether prepetition stay waivers are enforceable reflects the tension between the public policies favoring out of court work outs, on the one hand, and protecting the collective interest of the debtor's creditors on the other. Three basic approaches have emerged: (1) uphold the stay waiver in broad unqualified terms on the basis of freedom of contract; *In Club Tower, L.P.*138 B.R. 307 (Bankr. N.D. Ga. 1991); (2) reject the stay waiver as unenforceable per se as against public policy, *Matter of Pease*, 195

---

[6] The Court notes that this basis for relief was not raised in EAF's Motion for Relief from Stay (or brief), nor did EAF move to strike the Debtor's objection to the Motion for Relief from Stay upon filing. It was not until opening statements at trial on the Motion for Relief from Stay that EAF's counsel "referenced" this provision of the Forbearance Agreement.

B.R. 431 (Bankr. D. Neb. 1996); and (3) treat the waiver as a factor in deciding whether "cause" exists to lift the stay. *In re Shady Grove Tech Center Associates, Ltd. P'ship*, 216 B.R. 386 (Bankr. D. Md. 1998), opinion supplemented on remand from district court, 227 B.R. 422 (Bankr. D. Md. 1998).

*Id*. Waiver provisions are not "per se enforceable, nor are they self-executing," *In re Desai*, 282 B.R. 527, 532 (Bankr. M.D. Ga. 2002), and even courts that uphold such waivers require the creditor to first obtain relief from the automatic stay. *In re Powers,* 170 B.R. 480, 483 (Bankr. D. Mass. 1994); *In re Sky Group Int'l, Inc.*, 108 B.R. 86, 88 (Bankr. W.D. Pa. 1989).

The cases that uphold waiver provisions focus largely on public policy considerations and tend to be single asset cases, or cases where the bankruptcy was filed in "bad faith." *See In re Atrium High Point Ltd. P'ship*, 189 B.R. 599 (Bankr. M.D.N.C. 1995) (waiver provision may be appropriate where enforcement do not violate public policy concerns but are not binding on third-party creditors); *In re Cheeks*, 167 B.R. 817 (Bankr. D. S.C. 1994) (pre-petition waivers enforceable as they encourage out of court settlement); *In re Club Tower, L.P.,* 138 B.R. 307 (Bankr. N.D. Ga. 1991 (pre-petition agreement containing waiver binding on the parties where bankruptcy was filed in bad faith). The reasoning behind each decision varies but a central tenet is that enforcing pre-petition waiver provisions, particularly waiver provisions that are encompassed in a forbearance or other settlement agreement, "furthers the legitimate public policy of out-of-court restructuring and settlements." *Atrium High Point* at 606. As the *Cheeks* court stated:

> Perhaps the most compelling reason for enforcement of the [pre-petition waiver] is to further the public policy in favor of encouraging out-of-of court restructuring and settlement…. Bankruptcy courts may be an appropriate forum for resolving many of society's problems, but some disputes are best decided through other means.

*Cheeks,* 167 B.R. at 818.

A second approach, which currently represents the trending position, does not look at pre-petition stay waivers in terms of being "enforceable" or "unenforceable." Instead, courts in these cases treat the waiver as just one of several factors to be considered in determining whether "cause" exists to lift the automatic stay. *In re 4848, LLC*. 490 B.R. at 348; *Triple A & R Capital Investment, Inc.*, 519 B.R. at 584. There is no standard "test" or uniform set of factors that the courts employ to determine whether relief from the stay is appropriate. Generally, however, courts consider the following factors or variations thereof: (1) the sophistication of the parties and whether the parties were represented by experienced counsel; (2) the consideration given for the waiver, specifically, including the length of the waiver period and the risks assumed and concessions granted by the lender; (3) the effect on other parties such as unsecured creditors and junior lien holders; (4) the feasibility of the debtor's plan; (5) whether there is evidence that waiver was obtained by coercion, fraud, or mutual mistake of material facts; (6) whether enforcing the agreement will advance the legitimate public policy of encouraging out of court settlements and restructuring; (7) whether there appears to be a likelihood of reorganization; (8) the extent to which the creditor would be prejudiced if the waiver is not enforced; (9) the time gap and changes in circumstances between the date of the waiver and the date of the bankruptcy filing; and (10) whether the debtor has equity in the property and if the lender is otherwise entitled to relief from the automatic stay under the Bankruptcy Code. *See In re Atrium High Point Ltd. P'ship*, 216 B.R.599 (Bankr. M.D.N.C. 1995); *4848. LLC* at 349; *In re Frye*, 320 B.R. 786, 791 (Bankr. Vt. 2005). The weight to be given to each factor is discretionary, and some factors may be weighted more heavily than others, based on the facts and circumstances of the case. *Frye* at 791.

While both of these approaches raise valid arguments for enforcing pre-petition stay waivers, this Court finds that the better approach is one that declines enforcement of such provisions. The oft-cited case for prohibiting stay waivers, *per se*, is *In the Matter of Pease*, 195 B.R. 431 (Bankr. D. Neb. 1996). There, the farmer debtors entered into a pre-petition debt resolution agreement with their lender, United Nebraska Bank, which held a secured claim in excess of $1.8 million. The parties' agreement prohibited the debtors from filing bankruptcy and, further, if the debtors did file a bankruptcy petition, the agreement prohibited them from challenging both a motion to lift the automatic stay under § 362 and a motion to dismiss case. *Id.* at. 432. Debtors subsequently filed a petition under Chapter 11 and the Bank moved for relief from stay based on the contract waiver.

Although the *Pease* court acknowledged that the current majority judicial view was to enforce prepetition waivers of the automatic stay, *Id.*, it declined to follow the emerging trend and held that such waivers were unenforceable, *per se*. *Id.* at 433. The court cited three bases for invalidating the waiver: (1) the debtors did not have the capacity to act on behalf of the debtor in possession; (2) the waiver would "limit the effectiveness" of certain bankruptcy provisions such as §§ 363 365, 541; and (3) "the Bankruptcy Code extinguishes the private right to freedom to contract around its essential provisions." *Id.* at 433. It explained:

> First, before the bankruptcy case is filed, the debtor does not have the capacity to waive the rights bestowed by the Bankruptcy Code upon a Chapter 11 debtor in possession. Prior to the commencement of the bankruptcy case, the debtor entity has the capacity to enter into an agreement binding upon the debtor under applicable non-bankruptcy law. Upon commencement of a Chapter 11 bankruptcy case, the debtor becomes a 'debtor in possession' with a fiduciary duty to creditors and rights and obligations under federal law. Those rights include enforcement of the automatic stay.... In this sense, the Chapter 11 debtor is a separate and distinct entity from the pre-bankruptcy debtor.... [T]he pre-bankruptcy debtor simply does not have the capacity to waive rights bestowed by the Bankruptcy Code upon the debtor in possession, particularly when those rights are as fundamental as the automatic stay. A debtor may not waive the automatic

10

stay of § 362 until the bankruptcy case is commenced and the debtor is acting in the capacity as debtor in possession….

\*\*\*

Second, the Bankruptcy Code explicitly invalidates provisions of private agreements that deprive the debtor of the use and benefit of property upon the filing of the bankruptcy case.  For example Bankruptcy Code §§541(c), 363((*l*) and 365(e) provide, respectively that an interest of a debtor in property becomes property of the bankruptcy estate, and that the debtor is permitted to use, sell or lease the property…, *notwithstanding any provision in an agreement that is conditioned on the insolvency or financial condition of the debtor or the filing of the bankruptcy case.*  Congress thus explicitly chose to invalidate provisions of private agreements that deprive the debtor of the use and benefit of property upon the filing of a bankruptcy case.

\*\*\*

Third, and finally, the Bankruptcy Code extinguishes the private right of freedom to contract around its essential provisions.  This conclusion follows from the comprehensive nature of the Bankruptcy Code and its underlying purpose of providing a nationally uniform collective remedy to debtors and creditors.  The judicial enforcement of a contractual waiver of the automatic stay would permit a single creditor to opt out of the collective process mandated by the Bankruptcy Code to the potential detriment of the debtor and other creditors.  This should not be permitted….

*Id*. at 433-434.

While the *Pease* court invalidated the contractual waiver, it noted that the creditor was not without adequate remedies, such as seeking relief from stay for cause under § 362(d); filing a liquidating plan under § 1121; seeking dismissal or conversion of the case to Chapter 7 under § 1112; or requesting the appointment of a trustee or examiner pursuant to § 1104.  *Id.* at 435. In light of these alternatives, the court concluded that enforcement of the waiver was unnecessary.

The concerns raised in *Pease* were echoed by the court in *In re Jeff Benfield Nursery, Inc.*, 565 B.R. 603 (Bankr. W.D.N.C. 2017).  In declining to enforce a pre-petition waiver, the court explained:

Courts have taken a variety of approaches to such pre-petition stay waivers, emphasizing either the encouragement of out-of-court settlements on one hand, or the countervailing concerns of promoting reorganization and equality among

11

creditors on the other.  *See In re Atrium High Point Ltd. P'ship*, 189 B.R. 599-606-06 (Bankr. M.D.N.C. 1995) (collecting cases).  However, this Court concludes that such provisions, which effectively render the automatic stay meaningless, are unenforceable as a matter of public policy.  Upholding pre-petition waivers of this sort deprives debtors of the 'breathing spell' contemplated by the Bankruptcy Code and thwarts the congressional intent underlying imposition of the automatic stay.' [P]repetition agreements purporting to interfere with a debtor's rights under the Bankruptcy Code are not enforceable.' *In re Intervention Energy Holdings, LLC,* 553 B.R. 258, 263 (Bankr. D. Del. 2016) (citing *MBNA Am. Bank, N.A. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc)*, 275 B.R. 712, 723 (Bankr. D. Del. 2002)).  '[I]t would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply.' *Id.* (citing *In re 203 N. LaSalle St. P'ship*, 246 B.R. 325-331 (Bankr. N.D. Ill. 2000)).

*Id.* at 608-09.

Interestingly, the *Jeff Benfield Nursery* court also noted that even in the absence of a *per se* rule against enforcement of pre-petition waivers, the agreement in that case would still not be enforced.  Citing such factors as the lack of any bargained-for exchange with respect to the waiver language, debtor's significant equity in the property, and the negative impact of the waiver on the debtor's other creditors, the court concluded that the stay waiver would still be unenforceable even when analyzed under a "factor" approach.  *Id.* at 609-10.

This Court agrees with the reasoning advanced in *Pease* and *Jeff Benfield Nursery* and concludes that pre-petition fee waivers are *per se* unenforceable.  This approach best protects the rights and interests of the debtor-in-possession and *all* creditors under the Bankruptcy Code—not just those of the creditor asserting the waiver.  As explained in *Pease*, a pre-petition debtor and a post-petition debtor-in-possession are two separate and distinct entities.  A pre-petition debtor simply lacks the capacity to bargain away rights that arise post-petition in favor of the debtor-in-possession. *Peace*, 195 B.R. at 433.

Further, as the court noted in *Jeff Benfield Nursery*, pre-petition stay waivers may negatively affect the debtor's other creditors who were not parties to the waiver agreement.  As

Debtor's counsel noted in his brief, EAF is not the Debtor's largest creditor.  The Debtor's single

largest creditor is Royal Banks of Missouri ("Royal Banks").  Pursuant to a settlement agreement

approved by this Court on October 4, 2024, Royal Banks holds an allowed claim in the Debtor's

bankruptcy case in the amount of $13,486,879.80.  *See Settlement Agreement*, ECF Doc. 67, ¶

12(b).  However, Royal Banks has agreed to accept the total sum of $300,000.00 in settlement of

its claim through the bankruptcy, which is of *substantial* benefit to the Debtor. *Id.* at ¶ 12(a).

Given that EAF has a security interest in nearly all of the Debtor's real and personal property,

prohibiting Debtor from even attempting to defend the Motion for Relief from Stay would

effectively terminate this case.  This would result in Royal Banks, as well as the Debtor's other

unsecured creditors receiving absolutely nothing.  *See Debtor's Brief in Opposition to Motion for*

*Relief from Stay Based on Alleged Consent*, ECF Doc. 140, p. 8-9.  While the pre-petition Debtor

may have consented to waiver of the automatic stay in favor of EAF, Royal Banks and other

creditors did not. The automatic stay "is designed to protect both debtors and creditors alike."

*Atrium High Point*, 189 B.R. at 607.  Enforcing the stay waiver in this case would benefit no one

other than EAF.

### B. Is EAF Entitled to Relief from Stay to Record Its Deed in Lieu of Foreclosure Due to Debtor's Default Under Forbearance Agreement?

Having concluded that the pre-petition stay waiver is unenforceable, the Court now turns

to the other arguments that were raised by EAF in support of its Motion for Relief from Stay. For

its initial argument, EAF asserts that the Debtor's equitable interest in the Property transferred to

EAF upon execution of the Deed in Lieu of Foreclosure on May 28, 2024.  It maintains that as a

result, the Debtor no longer had an interest in the Properties when the Voluntary Petition was

filed and, therefore, it should be granted relief from the stay in order to record its deed.

Upon the filing of a bankruptcy petition, a bankruptcy estate is created which includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Pursuant to 11 U.S.C. § 362, the filing of the petition imposes an automatic stay which prevents creditors from taking certain actions against both the debtor and against property of the bankruptcy estate. Such prohibited actions include obtaining possession of property of the estate or to exercising control over estate property, 11 U.S.C. § 362(a)(3); creating perfecting or enforcing a lien against property of the estate, 11 U.S.C. § 362(a)(4); creating, perfecting, or enforcing a lien against the debtor's property to the extent that the lien secures a pre-petition claim, 11 U.S.C. § 362(a)(5); and collecting, recovering, or assessing pre-petition claims against the debtor, 11 U.S.C. § 362(a)(6). A party in interest may obtain relief from this stay, however, "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).

EAF asserts that pre-petition, the Debtor transferred its equitable rights in the Properties to EAF-- the beneficiary of the escrow agreement--via the forbearance agreement and escrow of the Properties. It contends that the Debtor retained only a contingent interest in the Properties that could only be exercised by repaying the loan within the seventy-five-day forbearance period. Consequently, EAF maintains that the Debtor's bankruptcy estate only "inherited this contingent interest to redeem under the terms of the Deed Agreement—a right that expired two days after DJK filed for bankruptcy in accordance with the escrow agreement. *See Effingham Asset Funding LLC's Brief in Support of Motion for Relief from Automatic Stay*, ECF Doc. 123, p. 3. Essentially, EAF argues that for all intents and purposes, it is already the owner of the Properties and simply needs relief from the stay to record the Deed in Lieu of Foreclosure and Bill of Sale.

In support of its position, EAF relies on two cases where courts granted relief from the automatic stay in order to allow a creditor to enforce its rights under a pre-petition deed in lieu of foreclosure agreement.  In *Prairie Crossing, LLC*, No. 99 C 3558, 2000WL 1468755 (N.D. Ill., Sept, 29, 2000), the debtor defaulted on its mortgage and its lender, First Bank, initiated foreclosure proceedings.  The parties subsequently entered into a deed in lieu of foreclosure agreement whereby the Debtor executed and placed into escrow a trustee's deed conveying its property to First Bank.  The parties' agreement further provided that if the Debtor did not pay its indebtedness to First Bank in full by the agreed deadline, the trustee's deed would be delivered to First Bank to record.  *Id.* at *1.  Debtor ultimately did not make the payment as required by the agreement and filed a Chapter 11 petition two days before the expiration of the payment deadline.

Like EAF, the creditor in *Prairie Crossing* brought a Motion for Relief from Stay under § 362(d)(1) for "cause" seeking relief from the stay in order to pursue its rights under the pre-petition forbearance agreement.  The bankruptcy court granted creditor's motion and decided as a matter of law that the debtor had no interest in the subject property after the expiration of the payment deadline. It even noted that its order granting relief from the automatic stay "may be only a 'comfort order,' as First Bank's Relief Motion could be viewed as moot." *Id.* at *4.

On appeal, the debtor raised several arguments including that granting relief was improper given that the value of the property greatly exceeded First Bank's debt, that the deed in lieu of foreclosure constituted a fraudulent conveyance pursuant to 11 U.S.C § 548, and that the deed in lieu of foreclosure constituted a preferential transfer under § 547. *Id.* at *4.   The District Court affirmed Bankruptcy Judge Lefkow's ruling, finding that she had "applied the undisputed fact that Debtor had given First Bank a Deed in Lieu of Foreclosure and the fact that Debtor had

not redeemed the property pursuant to the terms of the agreement as the extension afforded under

11 U.S.C. § 108(b)." The District Court summarized, with approval, the Bankruptcy Court's

opinion as follows:

> Judge Lefkow stated '[that] prior to the filing of the petition, Debtor had completely performed the acts required of it under the Agreement. Bank was entitled to the documents in escrow and to take other actions as specified in the Agreement once the date for payment passed with the contingency unfulfilled.' Judge Lefkow then concluded that the equity interest in the property did in fact belong to First Bank and not to Debtor, thus warranting lifting of the automatic stay. There was no need to weigh the value of the property against the amount owed by debtor as debtor had, by virtue of the voluntary agreement, given up its legal rights to recovery of its equity in the property .Once the date for redemption passed under the agreement, debtor would no longer be entitled to any equitable interest in the property and, therefore, the secured property is worthless in the hands of the debtor. In reaching its conclusion, the Court found significant 'the only thing standing between the transferee and the deed was the expiration of the redemption period.'

*Id.* at *5 (internal citations omitted). The *Prairie Crossing* court noted that while the debtor

possibly retained a contingent right if redemption was made within the requisite period, it was

undisputed that the title document was transferred to First Bank prior to the filing of the

bankruptcy petition and that Debtor failed to redeem the property within the required period. It

concluded, therefore, that "title transferred to First Bank upon the expiration of the redemption

period without any act by anyone." *Id.*

Similarly, in *In re NTA, LLC,* 380 F.3d 523 (1st Cir. 2004), the First Circuit Court of

Appeals held that under Illinois law, assets placed in escrow by a debtor pre-petition pursuant to

an agreement to avoid foreclosure were not property of the debtor's Chapter 11 bankruptcy

estate. In that case, after a pre-petition default on its loan, the debtor entered into an agreement

to avoid foreclosure whereby it agreed to place its business membership interests in escrow.

Pursuant to the terms of the agreement, unless the debtor either paid the loan in full or obtained

alternative financing by April 30, 2003, the debtor's membership interests would be transferred

16

to the lender.  Although the agreement contained a provision requiring the escrow agent to wait

two business days before distributing the membership interests in the event of noncompliance,

there was no provision in the agreement permitting the debtor to prevent the distribution of the

interests to the lender. *Id.* at 526.

On May 16, 2003, the lender advised the escrow agent that the debtor had failed to

comply with the terms of the parties' agreement.  The debtor unsuccessfully attempted to obtain

a temporary restraining order in Illinois on May 19, 2003.  Several hours later, but prior to the

expiration of the two-business day "waiting period," the debtor filed a Chapter 11 petition in the

United States Bankruptcy Court for the District of Massachusetts.  Debtor claimed that the

membership interests were property of its bankruptcy estate, and, in response, the lender moved

for relief from the stay in order to recover the membership interests from the escrow agent. Both

the bankruptcy court and the district court ruled in favor of the lender based on the terms of the

escrow agreement and the debtor appealed. *Id.* at 527.

The Court of Appeals affirmed the lower courts and concluded that debtor's contingent

right to "buy back" its membership interest under the agreement had expired prior to the filing of

the bankruptcy petition and, therefore, the bankruptcy estate had no interest in the property.  *Id.*

at 529.  In its discussion of Illinois law, the court explained:

> 'The law in Illinois regarding conditional delivery into escrow is well-established.
> Delivery of a deed into escrow does not convey title when the conveyance is
> contingent upon the occurrence of an event that entitles the grantee to possession
> of the deed.'  Although legal title does not transfer upon placing property in
> escrow, the grantor does not necessarily hold the same rights to the property as he
> did prior to the deposit. Rather, '[w]hen property is delivered in escrow, a trust is
> created.' The beneficiary of the trust holds an 'equitable interest' in the property,
> consisting of the right to obtain legal title to the property pursuant to the terms of
> the contractual agreement between the parties.  Thus, under Illinois law, when a
> grantor places property in escrow, the grantee holds an equitable interest in the
> escrowed property, defined by the agreements between the parties, even before
> the property is released and the grantee takes legal title.

*Id*. at 529-30 (internal citations omitted). The court held that "after [the debtor] signed the Standstill and escrow agreements and deposited its Membership Interests into escrow, [debtor's] right to the Membership Interest was simply a contractual right to prevent their distribution to [lender] and to buy them back by meeting the requirements for new financing outlined in the Standstill Agreement." *Id.* at 529. Further, it concluded that the debtor's bankruptcy estate "could no longer exercise the contingent interest that [debtor] held in the Membership Interests pursuant to the Standstill and Escrow Agreements" because the debtor failed to comply with the requirements of the Agreement and the bankruptcy estate's contingent right had "expired." *Id.*

Although the conclusions in *Prairie Crossing* and *NTA* are consistent with the position advocated by EAF, Debtor counters that both opinions have limited applicability because they are factually inapposite and fail to address relevant Illinois law. Instead, Debtor urges this Court to adopt the reasoning set forth in *In re Primes*, 518 B.R. 466, 477 (Bankr. N.D. Ill. 2014), in which the court treated a quit claim deed given in connection with a forbearance agreement as an equitable mortgage. After reviewing both parties' positions, authority and Illinois foreclosure law, this Court agrees that Debtor's position is the correct approach.

In *Primes,* a consumer Chapter 13 debtor entered into a pre-petition forbearance agreement with her mortgage lender, Alpine Bank and Trust Company, to stop a pending foreclosure action against her residential real estate. Under the agreement, the parties agreed to modify certain terms of their existing note, including the amount of the indebtedness owed, the maturity date of the loan and the amount of the monthly mortgage payments. *Id.* at 469. In addition, the debtor agreed to execute a quit claim deed to the lender for the subject property. However, the agreement required that this deed be held in escrow and not recorded or delivered to the lender until either the debtor defaulted under the agreement or failed to pay the loan in full

by the maturity date. *Id.* at 469-70. The forbearance agreement specifically provided that the recording of the deed would not release the debtor from any indebtedness owed to the lender, nor would it extinguish the debt owed. *Id.*

On July 13, 2011, the debtor executed the deed that purported to convey the subject real estate to the lender. The deed stated that it was "a deed in lieu of foreclosure under 735 ILCS 5/15-1401" and that all rights granted under the agreement would "remain as stated by Illinois law." *Id.* at 470. Upon debtor's execution of the deed, the lender voluntarily dismissed its foreclosure suit. Thereafter, the debtor failed to make her May and June 2013 payments under the agreement and, after failing to cure the default as provided by the agreement, the lender recorded the quit claim deed on August 9, 2013.

On September 25, 2013, the Debtor filed a Chapter 13 petition. Her plan provided that the quit claim deed notwithstanding, ownership of the residential real estate would remain vested in the debtor subject to lender Alpine's mortgage and that Debtor would repay the note as modified by the forbearance agreement through her Chapter 13 plan. *Id.* The lender responded by filing a motion for relief from the stay. It argued that the debtor was not entitled to possession of the property due to the quit claim deed. It further asserted that any plan proposal declaring the property vested in the debtor was invalid. *Id.* at 468. In addition, it maintained that because the debtor no longer had an ownership interest in the property, it was not necessary for her effective reorganization. *Id.*

The *Primes* court rejected the lender's arguments and ultimately concluded that at best, the deed in lieu of foreclosure created an equitable mortgage in favor of the lender. *Id.* at 472. Based on Illinois law, which will be discussed in greater detail below, the court opined that "a deed in escrow given in connection with a forbearance agreement is not presumed out of hand to

be a true transfer." *Id.* at 475.   The *Primes* court found that the deed did not constitute a deed in lieu of foreclose because "the parties did not intend for [it] to immediately transfer title to [the property]" *Id.* at 479, but, rather, agreed that a transfer would only occur in the event of a future default by the debtor. *Id.*  In addition, it was clear from the language of the subject forbearance agreement that the recording of the deed would not satisfy or extinguish the debtor's obligation to the lender.  *Id.*  As the court explained, "[t]he primary question for determining whether to treat the purported conveyance as a true transfer or simply additional security is whether the original indebtedness was satisfied or extinguished." *Id.* at 475.

Under Section 1207 of the Illinois Mortgage Foreclosure Law the term "mortgage" includes "every deed conveying real estate, although an absolute conveyance in its terms, which shall have been intended only as a security in the nature of a mortgage."  735 ILCS 5/15-1207(c). As the *Primes* court explained,

> [w]here it is demonstrated that the consideration for the deed is a prior indebtedness and it is demonstrated that the indebtedness was not satisfied by the purported conveyance, 'it will be presumed that a mortgage was intended.' *Wiemer v. Havana Nat'l Bank*, 32 Ill. App. 3d, 578, 355 N.E.2d 506, 511 (1975) (citing *Wallace v. Greenman*, 321 Ill. 423, 152, N.E. 137 (1926).  The party asserting that the transfer occurred bears 'the burden of proving otherwise.' *Id. This is because a purported transferee 'cannot hold the land absolutely, and at the same time retain the right to enforce payment of the debt, on account of which it was made.' Id.*  at 586, 335 N.E.2d 506 (*quoting Sutphen v. Cushman*, 35 Ill. "I186 (1864).

*Primes* at 473 (emphasis added).

One of the primary reasons for construing such transfers as equitable mortgages is to ensure that mortgagors retain their redemption rights. A review of Illinois caselaw makes it abundantly clear that courts in this State have "consistently held that the law favors redemptions."  *Household Bank, FSB v. Lewis*, 229 Ill. 2d 173, 182, 890 N.E.2d 935, 939, 322 Ill. Dec. 15, 20 (2008), and "take a dim view of any attempt to limit or extinguish the

mortgagor's equitable right of redemption." *First. Ill. Nat'l Bank v. Hans*, 143 Ill. App. 3d 1033,

1037, 493 N.E.2d 1171 1174, 98 Ill. Dec.150. 153 (4th Dis. 1986).  In fact, "Illinois law

invalidates . . . agreement[s] made in advance to provide or convey a quit claim deed upon future

default or to waive the equitable right of redemption where it is 'part of' or 'in connection with

an original mortgage."  *Primes* at 473, *citing Hans*, 143 Ill. App. 3d at 1037, 493 N.E.2d at 1174,

98 Ill. Dec. at 53.

The doctrine of equitable mortgage applies specifically to deeds executed after the

creation of the debt, such as forbearance or refinancing agreements. *Id.* at 473.  As the court

explained, although a mortgagor may voluntarily agree to relinquish their interest in real

property, "Illinois statutes and established case law generally require the purported transfer to be

found void or recharacterized, particularly where the transfer is to a lender and contingent on a

future default." *Primes* at 472.  Further the parties' intention to transfer the property in the event

of a default without the need for judicial foreclosure proceedings is "not dispositive." *Primes* at

475.

> [N]othing is more firmly established in the law of mortgages than that it is not
> competent for the parties, even by express stipulation, to cut off the right of
> redemption, and to permit them to make such an instrument an absolute deed
> upon some future contingency, would simply be cutting off the right  of
> redemption, which as we have just seen, can not be done.

*Bearss v. Ford*, 108 Ill. 16, 26 (Ill. 1883).

It should be noted that the *Primes* court did address the *Prairie Crossing* case cited by

EAF.  Importantly, the court pointed out that "*Prairie Crossing* contain[ed] [no] reference to the

doctrine of equitable mortgage or whether a contingent deed in lieu must be recharacterized under

Illinois law as a mortgage, and, therefore, [did] not furnish precedent for the issue [at bar]."

*Primes*, 518 B.R. at 477.  *See also Legal Services Corp. v. Velazquez*, 531 U.S. 533,557, 121 S.Ct.

1043, 149 L.Ed.2d 63 (2001) (Scalia, J., dissent) ("judicial decisions do not stand as binding 'precedent' for points that were not raised, nor argued and hence not analyzed."). This Court agrees. Likewise, this Court notes that the *NTA* case cited by EAF also did not discuss equitable mortgages. *NTA*, too, is distinguishable from *Prairie Crossing*, *Primes*, and the case before this Court because in *NTA*, the deadline for curing the default expired prior to the filing of the debtor's bankruptcy.

In the instant case, the Agreement did not purport to transfer title to the Properties to EAF upon execution of the Deed and the Bill of Sale. Upon execution of the Agreement, EAF could *only* seek to record the Deed and Bill in the event of a future default by the Debtor. *Stipulation of Facts*, ECF Doc. 29 at ¶ 43. Had the Debtor paid EAF the outstanding balance on the loan on or before the August 12, 2024 deadline, EAF would have had no right to record the Deed and Bill of Sale whatsoever. *Id.* at ¶ 44. *Agreement,* Debtor's Trial Exhibit 4, ¶ 2. Further, the Agreement contained multiple provisions where EAF reserved all of its rights and remedies, including the right to elect to foreclose under the original loan documents.[7] In fact, EAF admits that upon expiration of the payment deadline on August 12, 2024, it "had the option under the Forbearance Agreement to elect to terminate the Forbearance Agreement and foreclose on the Debtor's Property pursuant to its loan documents or elect to effectuate the recording of the Deed. *Stipulation of Facts* at ¶ 35. This provision is inconsistent with ownership. Had ECF acquired an ownership interest in the Properties upon execution of the deed, pursuing foreclosure under the loan documents would be unnecessary.

The fact that EAF retained the right to foreclose speaks more to the Debtor's ownership interest. Retention of this right was necessary because the Debtor still owned the property, and

---

[7] *See, e.g.,* ¶¶ 2, 5(b), and 11.

the foreclosure right allowed EAF to foreclose any subsequent lien recorded against the Debtor. If EAF actually possessed the ownership interest, foreclosure would not have been necessary to eliminate subsequently recorded liens against the Debtor because they would not have attached to EAF property.  For instance, an IRS tax lien against the Debtor would not have attached to property owned by EAF. However, a foreclosure would be necessary to avoid a tax lien against the Debtor recorded against its property.

Further, there is no suggestion in the instant case that the Debtor's debt to EAF was extinguished upon execution of the Deed or that the Agreement eliminated Debtor's obligations to EAF.  To the contrary, the Agreement makes clear that the obligation remained, at least until such time as the underlying debt was paid in full.  Although Paragraph 5(b) states that "[t]he Deed shall be conveyed in lieu of foreclosure of the Lien and in full satisfaction of the Loan," it goes on to provide for foreclosure remedies in the event that loan is not paid in full upon expiration of the prescribed deadline.  *Agreement*, Debtor's Exhibit 4, ¶ 5(b).  Similarly, under the Agreement's remedies provision, Debtor remained liable for damages in the event of a default, including liability for EAF's attorney's fees, and EAF was entitled to terminate the Agreement and proceed with its rights under the loan documents *Id.* at ¶ 11.  Even the "hold harmless" provision of the Agreement is conditional.  Paragraph 15 provides that the Debtor and any guarantors shall be relieved of all personal liability with respect to the underlying loan "*upon recordation of the Deed, and subject to the terms of [the] Agreement*."  *Id.* at ¶15 (emphasis added).  The Agreement makes clear that EAF did not relieve Debtor of its obligations under the loan documents upon execution of the Deed.  Instead, forgiveness of the debt was conditional on Debtor's performance under the Agreement.

The Illinois Supreme Court has long made clear that [i]f liability…is left as subsisting and, if the grantor is regarded as still owing and bound to pay it at some future time…then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instruments." *Schwarzentruber v. Stephens*, 8 Ill.2d 222, 133 N.E.2d 33 (1956), *quoting Illinois Trust Co. of Paris v. Bibo*, 328 Ill. 252, 259, 159 N.E.2d 254, 257 (Ill. 1927).[8] Given the conditional nature of the instrument and the Agreement's failure to forgive the indebtedness upon execution of the Deed, the Court finds that the Deed in this case was, at best, an equitable mortgage and did not convey the Debtor's right title and interest to the Properties.

As an additional matter, in its pleadings, the Debtor argues that contrary to the requirements of the Agreement, the Deed and Bill and Sale were not placed in escrow upon execution. *See Debtor's Brief,* ECF Doc. 124, p. 10. Instead, the documents were delivered to counsel for EAF'S lender, Prairie States Capital, where they presumably remained until August 9, 2024, when they were delivered by counsel to True Title Company, LLC, an escrow agent selected unilaterally by EAF. S*tipulation of Facts*, ECF Doc. 129, ¶¶ 38-39. It is unclear whether the Debtor is challenging the delivery into escrow to refute the existence of any alleged equitable interest in the property in favor of EAF,[9] or whether it is asserting that there was no conveyance of the Deed due to lack of proper delivery. In either event, because the Court has concluded that the Deed in question is an equitable mortgage rather than a warranty deed capable

---

[8] Interestingly, EAF's own Motion for Relief characterizes the Agreement and Deed as a security agreement. In Paragraph 5 of the Motion, EAF states that Debtor executed the Agreement and Deed in Lieu of Foreclosure "[to] further secure Debtor's obligations and in exchange for Lender forbearing on enforcing its rights under the Loan Documents…." *EAF's Motion for Relief from Stay*, ECF Doc. 74. ¶ 9. EAF does not say that the Deed was given in order to facilitate foreclosure proceedings; it was given to provide additional security.

[9] EAF's brief included an extensive discussion of Illinois escrow law. Citing *NTA*, EAF posited that "when a grantor places property into escrow, the grantee holds an equitable interest in the escrowed property, defined by the agreements between the parties, even before the property is released and the grantee takes legal title." *NTA*, 380 F.3d at 530/ *See EAF's Brief*, ECF Doc. 123, p. 7.

of transferring title, any alleged deficiencies in the escrow are no longer relevant for purposes of this inquiry.

## C. Is EAF Entitled to Relief from Stay for Cause Due to Diminishing Collateral Value?

Finally, in addition to seeking relief from stay based on the Deed in Lieu of Foreclosure and the Forbearance Agreement, EAF asserts that it is entitled to relief for "cause" under 11 U.S.C. § 362(d)(1) due to the diminishing value of its collateral.  As indicated in the prior section, "the court shall grant relief from stay…such as by terminating annulling modifying or conditioning such stay for cause, including the lack of adequate protection of any interest in property of such party in interest."  11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not define "cause," other than for lack of adequate protection.  *See In re Blan,* 237 B.R. 737, 739 (8th Cir. BAP 1999).  As a result, the courts consider a number of factors "based on a totality of the circumstances in each particular case."  *In re Wilson*, 116 F.3d 87, 90 (3rd Cir.1997). "Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay. *SCO Group*, 395 B.R. at 856 (*citing Baldino v. Wilson*, 116 F.3d 87, 90 (3rd Cir. 1997); *In re Laguna Assocs. Ltd.*, 30 F.3d 734, 737 (7th Cir. 1994).

In its Motion for Relief, EAF alleges that in addition to being in default under the Forbearance Agreement, the Debtor has not performed necessary renovations to the Hotel Property which are required of Holiday Inn franchisees. *Motion for Relief*, ECF Doc. 74, ¶ 22. EAF asserts that the operation of the Debtor's business is predicated on its good standing as a Holiday Inn franchisee, and that the value of the Properties is dependent on the maintenance of this relationship.  It avers that the Debtor has not proposed a feasible method for funding the requisite renovations and, consequently, the value of the Properties continues to decline.  EAF

fears a potential revocation of Debtor's right to operate as a Holiday Inn franchisee due to its failure to maintain and renovate the Hotel and, therefore, argues that there is cause to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1),

The Court conducted trial on this Motion for Relief from Stay on November 14, 2024. Kenneth Flier, the general manager of the Debtor, appeared and testified as to a number of issues, including the current condition of the Properties, the state of on-going and future renovations, Debtor's responsibilities as a Holiday Inn franchisee, and Debtor's proposals for funding required renovations. Mr. Flier exhibited a deep knowledge and understanding of the Debtor's operations, and the Court find him to be an extremely credible witness. Mr. Flier testified that he has served as the general manager of the Debtor, DJK Enterprises since its inception in 2018 and has worked on the Properties for 13 years. In his capacity as GM, he performs a number of duties regarding operation of the Properties, including accounting, overseeing department heads of the Hotel, Convention Center, and Restaurant Properties, employee benefits, and payroll. Mr. Flier testified that the Debtor's operations include a 112-room hotel, an on-site restaurant, and a 1500-person capacity convention center. It employs 48 to 50 full-time employees and 50 to 52 part-time employees, making it one of the largest employers in the Effingham community,

As to Debtor's franchise affiliation, the witness testified that the operational flag of the Hotel Property is Holiday Inn, under the parent company, Intercontinental Hotel Group (IHG). As a Holiday Inn franchisee, the Hotel is subject to periodic inspections. On its most recent inspection, conducted September 12, 2024, Debtor received all passing grades, and, in two areas, was rated as "excellent."[10]  *See IHG Quality Evaluation*, Debtor's Trial Exhibit 2, p. 2. In fact,

---

[10] In liking the scores to letter grades, the witness explained that the Debtor received one A+, one A, and two Bs.

Debtor is in the top 10% of Holiday Inn franchises nationally.  Mr. Flier testified that in addition to regular maintenance, Debtor has performed both pre-petition and post-petition improvements to the Hotel Property and he believes that it is in better condition now than it was when the bankruptcy petition was filed.  These upgrades included improving the lighting by installing required LED bulbs and fixtures, updating the front entryway, changing mirrors, changing bathroom lighting, and renovations to the pool and hot tub.  *See Pictures*, Debtor's Trial Exhibit 3.

According to the testimony, Holiday Inn franchises are required to make certain, on-going improvements pursuant to IH Property Improvement Plans or "PIPs" which ensure that franchise properties are kept up to date. For instance, Mr. Flier testified that several of the afore-referenced improvements, such as the lighting and mirrors, were made pursuant to this PIP. Debtor has been operating under its current PIP for approximately six years, it is approximately 15% to 20% completed, and there is no deadline for its competition. While some of the required improvements under the PIP are small and can be done quickly, others are much more extensive. Under questioning by EAF's counsel, Mr. Filer acknowledged that under IHG estimates, the cost of necessary PIP improvements would be $15,000.00 per room or a total of $1.7 million. However, Mr. Flier testified that the project could be completed for substantially less than projected by IHG and within the one-year period prescribed by the PIP.

According to Mr. Flier, the Debtor has never been in default under its PIP, nor has it ever received anything from IHG suggesting otherwise. He further testified, contrary to the assertions in EAF's Motion for Relief from Stay, that Debtor is not in jeopardy of losing its Holiday Inn franchise license over uncompleted improvements.[11]

---

[11] To the best of Mr. Flier's knowledge, no one from EAF has ever visited the Properties, nor has EAF ever had the Properties inspected.

As to Debtor's post-petition financial condition, Mr. Flier testified that not only has the Debtor made all adequate protection payments to EAF and other secured creditors as required, but it is also current on all of its post-petition vendor payments and franchise fees to Holiday Inn. The Debtor's Disclosure Statement, which Mr. Flier helped prepare, projects annual net profits of $900,000.00 for 2025, $1.1 million for 2026, $1.29 million for 2027, $1.5 million for 2028, and $1.7 million for 2029. *See Debtor's Disclosure Statement*, Debtor's Trial Exhibit 8, at Ex.2. Mr. Flier testified that he believed that these projections were accurate and "100% realistic."

In addition to Debtor's five-year annual income projections, the witness also provided testimony regarding the Debtor's post-petition Monthly Operating Reports. The August and September 2024 Reports show monthly profits of $94,311.00 and $45,000.00 respectively. *See Monthly Operating Reports*, Debtor's Trial Exhibits 9 and 10. Although the Report for October had not yet been filed at the time of trial, Mr. Flier estimated profits for that month of $44,000.00 to $45,000.00,[12] and he anticipated that November profits would exceed $100,000.00 due to a large upcoming event at the hotel. He testified that based on this income, the Debtor would be able to make its Chapter 11 Plan payments and carry out the provisions of its plan.

Mr. Flier's testimony at trial was uncontroverted. Despite the representations in its Motion, EAF offered no evidence to show that the Hotel Property is deteriorating or that the Debtor is in jeopardy of losing its Holiday Inn franchisee license. Further, EAF provided no evidence to contradict Mr. Flier's testimony regarding the Debtor's post-petition financial condition or its income projections. The parties have stipulated that Debtor anticipates that its 2024 revenue will exceed its 2023 revenue of $7.0 million, and further, that 2025 will be its best

---

[12] The October Report was filed post-trial on November 19, 2024 and indicates that Debtor had profits of $83,641.00, well in excess of the estimated amounts. *See* Monthly Operating Report for the Period Ending October 31, 2024, ECF Doc. 135.

year ever in terms of revenue.  *Stipulation of Facts*, ECF Doc. 129, ¶ 8. They have also stipulated that Debtor's assets have a value in excess of $13.4 million dollars, which exceeds the amount of EAF's $10,750,000.00 secured claim and all other secured debt. Mr. Flier's unchallenged testimony was that the Debtor will have sufficient income to not only make the necessary payments under its Plan, but also to fund the necessary renovations and improvements under its IGH PIP.  Accordingly, the Court finds that the Debtor has failed to establish "cause" for granting relief from the stay under §362(d)(1) as to the grounds set forth in its Motion.

## <u>CONCLUSION</u>

Based on the above analysis, the Court concludes that there is no cause for granting relief from the automatic stay,  The Debtor's pre-petition waiver of the stay was ineffective as to the post-petition Chapter 11 Debtor-in-Possession and EAF has failed to sustain its burden of proving grounds for relief from stay for "cause" pursuant to § 362(d)(1) of the Bankruptcy Code. Further, the Properties subject to EAF's security interest were not transferred via the purported Deeds in Lieu of Foreclosure and remain property of this bankruptcy estate.  Accordingly, IT  IS ORDERED that the Motion for Relief from the Automatic Stay is DENIED.

A separate order shall enter.


ENTERED: February 13, 2025

／s/ Laura K. Grandy
_____
UNITED STATES BANKRUPTCY JUDGE